

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | | |
|---|---|---|---|
| Jeffrey Izant<br>Assistant United States Attorney<br>Jeffrey.Izant@usdoj.gov | Mailing Address<br>6500 Cherrywood Lane, Suite 200<br>Greenbelt, MD 20770-1249 | Office Location<br>6406 Ivy Lane, 8th Floor<br>Greenbelt, MD 20770-1249 | DIRECT 301-344-0229<br>MAIN 301-344-4433<br>FAX 301-344-4516 |

December 9, 2021

Adam D. Harris, Esq.
Law Office of Adam D. Harris, L.L.C.
600 Jefferson Plaza, Suite 201
Rockville, Maryland 20852
adam@adamharrislawfirm.com

_____ FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

FEB 17 2022

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

Re:   United States v. Christopher Allen Young,
      Criminal No. GJH-21-80

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (the "Agreement") that has been offered to your client, Christopher Allen Young (hereinafter the "Defendant"), by the United States Attorney's Office for the District of Maryland (the "Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. **This plea agreement is entered into and will be submitted to the Court pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.** If this offer has not been accepted by **5:00 p.m. on January 6, 2022**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1.     The Defendant agrees to plead guilty to Count One of the Indictment charging the Defendant with Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. § 1201(c). The Defendant admits that the Defendant is, in fact, guilty of the offense, and will so advise the Court.

### Elements of the Offense

2.     The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That, on or about the date alleged in the Indictment, in the District of Maryland and elsewhere, (1) the Defendant and one or more other persons entered the unlawful agreement charged in the Indictment, that is, an agreement to kidnap; (2) the Defendant knowingly and willfully became a member of that conspiracy; (3) one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the Indictment; and (4) the overt act was committed to further some objective of the conspiracy.

Penalties

3. The maximum penalties provided by statute for each offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1201(c) | N/A | Life | No more than 5 years | $250,000 | $100 |

    a.    Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

    b.    Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

    c.    Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

    d.    Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

    e.    Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

    f.    Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (i) the full amount of the fine or restitution is nonetheless due and owing immediately; (ii) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (iii) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that, by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pleaded not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed that would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" provisions below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further

trial or proceeding of any kind in the above-referenced case, and the Court will find the Defendant guilty.

        h.      By pleading guilty, the Defendant also will be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that, if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551–3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991–98. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

        a.      This Office and the Defendant further agree that the applicable base offense level is **32**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") §2A4.1(a).

        b.      A **2**-level increase applies, pursuant to U.S.S.G. §2A4.1(b)(3), because a dangerous weapon was used.

        c.      This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. §3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. §3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. §3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. §3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offenses; (iii) gives conflicting statements about the Defendant's involvement in the offenses; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal

4

conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

### Rule 11(c)(1)(C) Plea

9. The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that the imposition of a term of imprisonment of **126 months** in the custody of the Bureau of Prisons is the appropriate disposition of this case, taking into consideration the nature and circumstances of the offense, the Defendant's criminal history, and all of the other factors set forth in 18 U.S.C. § 3553(a).

10. This Agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of supervised release. In the event that the Court rejects this Agreement, except under the circumstances noted below, either party may elect to declare the Agreement null and void. Should the Defendant so elect, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that, if the Court finds that the Defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth herein, neither the Court nor this Office will be bound by the specific sentence contained in this Agreement, and the Defendant will not be able to withdraw his plea.

### Obligations of the Parties

11. At the time of sentencing, this Office and the Defendant agree to request a term of imprisonment **126 months**. This Office reserves the right to advocate for a reasonable period of supervised release and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

### Waiver of Appeal

12. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all rights, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent such challenges legally can be waived.

    b. If the Court imposes the agreed-upon term of imprisonment, the Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term or condition of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, or term or condition of supervised release).

    c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned case and agrees not to file any request for documents from this Office or any investigating agency.

### Restitution

13. The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses, which the parties stipulate is **at least $8,000**. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663, 3663A, 3563(b)(2), and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation, and that the Defendant is jointly and severally liable for this amount. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. The Defendant will make a good faith effort to pay any restitution. Regardless of the Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from the Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

### Forfeiture

14. The Defendant understands and agrees that, as a result of his guilty plea, he will not be permitted to own, possess, or use a firearm or ammunition.

15. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

16. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities.

17. The Defendant agrees to consent to the entry of such an Order of Forfeiture and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

18. The Defendant agrees to assist fully in the forfeiture of any such property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

19. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Defendant's Conduct Prior to Sentencing and Breach

20. Between now and the date of sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. §3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

21. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (a) this Office will be free from its obligations under this Agreement; (b) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C); and (c) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Consequences of Vacatur, Reversal, or Set-Aside

22. If a conviction entered pursuant to this Agreement is vacated, reversed, or set aside for any reason, then this Office will be released from its obligations under this Agreement, and any prosecution that is not time-barred as of the date of the signing of this Agreement (including any counts this Office has agreed to dismiss) may be commenced or reinstated against the Defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. The Defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date this Agreement is signed, and any applicable statute of limitations will be tolled from the date of this Agreement until 120 days after the vacatur, reversal, or set aside becomes final. The Defendant waives any defenses based on double jeopardy, pre-indictment delay, or the Speedy Trial Act.

## Entire Agreement

23. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties, and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Sincerely,

Erek L. Barron
United States Attorney

By: *[signature]* Digitally signed by JEFFREY IZANT
Date: 2021.12.09 16:17:18 -05'00'
Jeffrey J. Izant
Assistant United States Attorney   *JJI 2/17/22*

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

01-06-22
Date

*[signature]* Christopher Allen Young   *[signature] 02-17-22*

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement, with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

1/7/22
Date

*[signature]* Adam D. Harris, Esq.

9

## ATTACHMENT A
## STATEMENT OF FACTS

*The undersigned parties stipulate and agree that, if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Defendant, **CHRISTOPHER ALLEN YOUNG**, a/k/a "40" ("**YOUNG**"), conspired with **Darius Lawrence Young**, a/k/a "Mup" ("**Mup**"); **Anthony Erik Hebron**, a/k/a "Pain" ("**Hebron**"); **Tray David Sherman** ("**Sherman**"), and **Lamar Jamal Perkins** ("**Perkins**") to kidnap Victim A.

### The Kidnapping

On or about February 3, 2021, **Sherman** and **Hebron** met Victim A at the MGM Casino, a casino and hotel in Oxon Hill, Maryland. **Sherman** and **Hebron** falsely promised Victim A that they would get women for Victim A if Victim A went with them to Southeast Washington, D.C. At around 7:30 am, Victim A agreed to get into **Sherman**'s vehicle with **Sherman** and **Hebron**, and they drove from the MGM to Washington, D.C.

At 8:12 a.m., **YOUNG** received a call from **Hebron**. One minute later, **YOUNG** called **Mup** to report that **Sherman** and **Hebron** had "snatched" Victim A. **YOUNG** told **Mup** to get "any kind of gloves" and that "all we got to do is sit in the car" with Victim A while **Sherman** and **Hebron** robbed Victim A. **YOUNG** told **Mup** that he was going to split the robbery proceeds with **Sherman** and **Hebron**, and that he would pay **Mup** from his share. **YOUNG** added that, if Victim A "gets feisty, I don't want to have to crush him."

Between 8:22 a.m. and 8:30 a.m., **YOUNG** called **Hebron** approximately six times, and the calls between **YOUNG** and **Hebron** lasted a total of 4 minutes and 23 seconds. Soon thereafter, **Sherman**'s vehicle arrived in Southeast D.C., and **YOUNG** and **Mup** got into **Sherman**'s vehicle with **Sherman**, **Hebron**, and Victim A. **Hebron** pointed a gun at Victim A, and **Sherman**, **Hebron**, **YOUNG**, and **Mup** took Victim A's personal items, including Victim A's wallet, cellphone, and watch (which had been purchased for approximately $500), and the key to Victim A's hotel room at the MGM. **Sherman**, **Hebron**, **YOUNG**, and **Mup** then demanded the code to the safe in Victim A's hotel room. When Victim A refused, **Hebron** struck Victim A in the forehead with the gun. In response, Victim A gave up the code to his safe. **Hebron** then forced Victim A out of **Sherman**'s vehicle. **YOUNG** and **Mup** got out of **Sherman**'s vehicle with Victim A, and **Sherman** and **Hebron** drove back to the MGM.

As **Sherman** and **Hebron** were driving to the MGM, **YOUNG** and **Mup** led Victim A, at gunpoint, to a boiler room inside an apartment building in Southeast D.C. As **YOUNG** and **Mup** took Victim A inside the room, at around 9:10 a.m., **Mup** called **Perkins** and directed **Perkins** to look out for police or anyone else who might be near enough to hear or see **YOUNG** and **Mup** with Victim A. Inside the boiler room, **YOUNG** and **Mup** physically assaulted Victim A and threatened his life. **YOUNG** and **Mup** also demanded that Victim A disclose the PIN number for

his ATM card, which was in Victim A's wallet, and provide details about his hotel room, including what was in Victim A's hotel room safe. **Mup** then relayed this information to **Sherman** and **Hebron** by phone.

By 10:00 a.m., **Sherman** and **Hebron** had arrived back at the MGM. Video surveillance captured **Sherman** and **Hebron** walking empty-handed down the hallway toward Victim A's hotel room. Less than 15 minutes later, video surveillance captured **Sherman** and **Hebron** walking back from the area of Victim A's hotel room with a backpack and a roller suitcase. At 10:20 a.m., video surveillance captured **Sherman** and **Hebron** walking out of the MGM with the same backpack and roller suitcase. The backpack and roller suitcase contained items that **Sherman** and **Hebron** had stolen from Victim A's hotel room, including an Xbox, at least $1,500 in MGM Casino chips, and approximately $6,000 in U.S. currency. The total value of the property stolen from Victim A during the kidnapping (including Victim A's watch, casino chips, and U.S. currency) was at least $8,000.

When **YOUNG** and **Mup** learned that **Sherman** and **Hebron** had finished stealing Victim A's property from the hotel room, **YOUNG** and **Mup** fled the boiler room, leaving Victim A behind. At 10:57 a.m., law enforcement observed **YOUNG** and **Mup** walking away from the area of the boiler room and getting into **YOUNG**'s vehicle, which drove away. Moments later, just before 11 a.m., law enforcement located Victim A near the building in Southeast D.C. Blood was running down Victim A's face from a wound on his forehead. Victim A also appeared to have suffered cuts on his mouth and eye, and a broken nose.

The Debrief

Around the same time that law enforcement located Victim A, **YOUNG** and **Mup** called **Sherman** and **Hebron** to debrief the kidnapping. **Hebron** told **YOUNG** and **Mup** that they were supposed to threaten Victim A and take "everything off him." **YOUNG** protested, "Man, you're talking to a mother fucking vet!" **YOUNG** added, "[Victim A] was scared as shit! I said, 'If the police come, or anything come, I got your address. Mom . . . your little brother, all them is gone!'" **YOUNG** continued, "I was trying to do the reverse psychology. I was like, man, I said, 'I see why you so tense.' I said, 'Cause you know that money in there and when we find out that money in there, you going to die.' . . . Me and **Mup** was playing good cop bad cop on [Victim A]. . . . I mean good cop, bad robber." **Mup** then vouched for **YOUNG**, stating, "40 [**YOUNG**] was bipolar. He would be cool with [Victim A] then motherfucking do the crazy. . . . 40 [**YOUNG**] told [Victim A], 'When you think of somebody, raise a hand. Other than that, shut the fuck up!'"

The continuing conversation revealed that **YOUNG** and **Hebron** had previously discussed kidnapping another target. **YOUNG** told **Hebron** that **Young** thought Victim A was "[t]he other dude, you been telling me about." **Hebron** responded, "Nah, hell, nah! We ain't catching [the other dude] on no humble like that," meaning that the other target would be more difficult to kidnap. **Sherman** clarified that the decision to kidnap Victim A was a spontaneous one made by **Hebron** and **Sherman**, who stated, "Hey 40 [**Young**], I ain't gonna lie, bro, this was just like a little, uh, uh, spur of the moment, little sweet lick, bro, that we were just talking like, not passing up no more licks."

2

**YOUNG**, **Mup**, **Sherman**, and **Hebron** also discussed whether law enforcement would be able to connect them to the kidnapping. **Sherman** expressed concern about using cards from Victim A's wallet, stating, "I mean if you do it, we got to do it now, we got to hurry up." **YOUNG** responded, "Yeah, we got to do that shit now. He ain't got no phone or nothing." **Sherman** continued, "I just feel like I'm leaving a paper trail, slim." **YOUNG** replied, "No, we already left a paper trail by y'all snatching him in your car and me pulling up the way and we holding him captive, that's the way." But **YOUNG** added that he and **Mup** "put [Victim A] in the boiler room. We took him inside so nobody ain't see us or hear. They just seen us walking back there. They don't know what we did."

**YOUNG**, **Sherman**, **Hebron** and **Mup** further discussed the possibility that Victim A would speak to police. **YOUNG** stated, "[I]f [Victim A] snitch, all he going to say is the niggas grabbed him from MGM and he met up with other motherfuckers. So, regardless, if he snitch, we might be hit. Fuck it. Fuck him." **Sherman** then rehearsed a defense that he and **Hebron** could use: "That MGM shit ain't about nothing like, what the fuck . . . he walked us in, walked with us . . . I don't know what happened to you. That nigga be lying." **YOUNG** added, "Man, [Victim A] ain't going to tell man. Man, y'all took coke and weed from that man, he ain't going to tell nothing. . . . Man, [Victim A] said . . . 'Bro, just swipe all the cards. I don't care.' He said, 'You got all day, I'm going to call tomorrow and report them stolen.'"

**Sherman**, nevertheless, continued to worry, stating, "I ain't no dummy . . . right now, [Victim A] could rat on me." Referring to the fact that **Sherman** had driven back to the MGM in his own vehicle, **Sherman** reflected:

> I was just on camera with the nigga, bro. We was just with him. I already took plenty of chances by going back up there in my own shit. That was the point of me calling you, so I won't go up there in my own shit again. . . . Then I'm saying, bro, like, I can beat the fact that if he rats, like, yeah, they, we, he to, he walked us to the room. Walked us out. We just smoked outside, we just walked to my car, we came back in different clothes, you know what I'm saying? We cool. But when you get to swiping the card, that shit going to support his, his, his story, somebody robbed him, 'cause somebody used his cards. You get what I'm saying?

**YOUNG** remained unconcerned, emphasizing, "Son, that nigga, swear to God, he got smacked with a pistol and all that." **Sherman** agreed, "[Victim A] was fucked up, bro!" The conversation continued:

| | |
|---|---|
| **YOUNG**: | **Pain [Hebron]** smacked the sense out of his ass. |
| **Sherman**: | Man, on my mother, he ain't going to the law, bro . . . he's fucked up, he's twisted, bro. |
| **YOUNG**: | Man, that nigga say "I'm never fucking with no DC niggas ever again in my life. Fuck no!" |

3

**Sherman:** That's what he said?

**YOUNG:** Bro, he look like he was about cry, he meant that shit.

SO STIPULATED:

_Jeffrey J. Izant_ (Digitally signed by JEFFREY IZANT, Date: 2021.12.09 16:18:05 -05'00')
Jeffrey J. Izant
Assistant United States Attorney   2/17/22

_Christopher Allen Young_   02-17-22
Christopher Allen Young
Defendant

_Adam D. Harris_
Adam D. Harris, Esq.
Counsel for Defendant

4