IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | *   CRIMINAL NO. GJH-21-80 |
| CHRISTOPHER ALLEN YOUNG, | * |
| a/k/a "40," | * |
| | * |
| Defendant. | * |
| ******* | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of American respectfully submits the following memorandum in aid of sentencing in the above-captioned case, which is scheduled for May 5, 2022. On February 17, 2022, the Defendant, Christopher Allen Young, pleaded guilty to a single-count indictment charging conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c). Consistent with the plea agreement in this case, and pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the government requests that the Court impose a guidelines sentence of 126 months' imprisonment, to be followed by five years of supervised release, as well as restitution in the amount of $8,000.

### I.     Background

In pleading guilty, the Defendant entered into a plea agreement containing a detailed stipulation of facts. *See* ECF 107. The government will not repeat those facts here. In sum, the facts establish that the Defendant conspired with his four co-defendants to kidnap Victim A. The Defendant, specifically, admitted that he led Victim A at gunpoint into a small utility closet (*i.e.*, a "boiler room") in an apartment building in Southeast Washington, D.C. There, the Defendant and a co-defendant held Victim A captive and threatened to kill Victim A if Victim A did not give

1

up information about Victim A's valuables inside a room at the MGM Casino and Hotel. The Defendant also threatened to kill Victim A's family if he reported the kidnapping to police.

The Defendant's conviction for kidnapping conspiracy carries a statutory maximum punishment of life imprisonment and five years of supervised release. *See* 18 U.S.C. § 1201. Through the plea agreement, the parties have agreed that the applicable base offense level is 32, pursuant to U.S.S.G. §2A4.1(a). The parties further agreed that a 2-level increase applies, pursuant to U.S.S.G. §2A4.1(b)(3), because a dangerous weapon was used. The government does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. §3E1.1(a) based on the Defendant's prompt recognition and affirmative acceptance of responsibility for criminal conduct. The government also will make a motion pursuant to U.S.S.G. §3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of his intention to enter a guilty plea.

Accordingly, the parties contemplated that the Defendant's final adjusted offense level would be 31. The Presentence Investigation Report prepared by the U.S. Probation Office reaches the same conclusion. *See* ECF 116. The PSR also concluded that the Defendant is in criminal history category II. *See id.* ¶ 43. Accordingly, the Defendant's guidelines range of imprisonment is 121 to 151 months, *see id.* ¶ 82; and the guidelines range of supervised release is two to five years, *see id.* ¶ 85.

II.     **Section 3553(a) Analysis**

As the U.S. Probation Office similarly concluded, a guidelines term of 126 months' imprisonment, to followed by 5 years of supervised release, is sufficient but not greater than necessary to achieve the relevant sentencing goals set forth in 18 U.S.C. § 3553.

### A.     The Nature and Circumstances of the Offense

The nature and circumstances of the Defendant's offense plainly support the imposition of a guidelines sentence.  *See* 18 U.S.C. § 3553(a)(1).

Though the Defendant did not initially hatch the plot to kidnap Victim A, the Defendant was a crucial part of the operation and was key to its execution.  First, the Defendant recruited and supervised his brother, Mup, in carrying out the kidnapping.  Early in the morning on February 3, 2021, the Defendant called Mup and directed him to get gloves so they could hold Victim A against his will, while Sherman and Hebron stole Victim A's valuables from the MGM.  The Defendant also recruited Mup by promising that, in exchange for Mup's assistance in the kidnapping, the Defendant would pay Mup from the Defendant's share of the proceeds.  And the Defendant provided the escape vehicle in which the Defendant and Mup fled the site of the kidnapping.

The Defendant also supplied the violence that was critical to the kidnapping's "success." Even before the Defendant met Victim A, the Defendant indicated that he was prepared to use violence.  At the outset, the Defendant told Mup that, although the Defendant was willing, he did not "want to have to crush [Victim A]" if Victim A resisted.  When they encountered Victim A, as the Defendant and Mup later recounted, the Defendant and Mup "play[ed] good cop bad cop" on Victim A—with the Defendant being the "bad cop" who physically assaulted and threatened Victim A into disclosing his PIN number and details about Victim A's hotel room.

Finally, it was the Defendant's role to intimidate Victim A to prevent Victim A from reporting the kidnapping to police.  Not only did the Defendant tell Victim A, "[Y]ou going to die," but the Defendant also threatened Victim A's family, stating, "If the police come, or anything come, I got your address.  Mom . . . your little brother, all them is gone!"  Even more reprehensibly, the Defendant appeared to revel in the pain and suffering that he and his co-defendants inflicted

3

on Victim A. The Defendant bragged about making Victim A cry; the Defendant celebrated how Hebron, too, "smacked the sense out of his ass"; and the Defendant assured his co-defendants that, based on his conduct, Victim A would not report them to law enforcement.

### B.     The History and Characteristics of the Defendant

The Defendant's history and characteristics likewise support a guidelines sentence of imprisonment. *See* 18 U.S.C. § 3553(a)(1).

The Defendant knew the right way to treat people. He reported no history of abuse or neglect. *See* PSR ¶ 62. His mother reported that he was a "great" father to his children. *See id.* ¶ 63. And the Defendant was capable of being gainfully employed. *See id.* ¶¶ 77–78. But by the time he committed this offense, the Defendant had resigned from two separate jobs in two years. *See id.* He was living rent-free alternately at his mother's or his finacée's homes. *See id.* ¶ 64. He was collecting unemployment benefits. *See id.* ¶ 76. And, on Wednesday, February 3, 2021, rather than looking for work, the Defendant began his day by preparing to commit a kidnapping.

Nor was this the Defendant's first use of weapons to steal from others. When Hebron appeared to criticize the Defendant's conduct during the kidnapping, the Defendant responded, "Man, you're talking to a motherfucking vet," that is, a veteran of armed robberies. This was not some braggadocio; the Defendant had, in fact, been convicted of armed robbery in D.C. Superior Court in 2013. *See id.* ¶ 40. At the time he committed the armed robbery, the Defendant was on court-ordered GPS monitoring in connection with a prior offense. According to the criminal complaint, the Defendant committed the armed robbery by stealing the victim's dog at gunpoint. Like Victim A, the victim in that case feared for her life. *See id.* Thus, by February 2021, the Defendant knew what he was doing. By his own admission, he was a seasoned professional.

### C. The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

A 126-month sentence is also supported by the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

As a general matter, kidnappings are extremely serious offenses. But the kidnapping carried out by the Defendant and his co-conspirators stands out as unusually dangerous and extreme. The Defendant and his co-conspirators did not kidnap someone with whom any of them had a prior relationship. They kidnapped Victim A, who—before February 3, 2021—was a complete stranger to them. The conspirators, moreover, kidnapped Victim A from a popular public place, and they did so in broad daylight. Then, rather than taking Victim A to some secluded location, the Defendant and his co-conspirators held Victim A at gunpoint inside a utility closet in the basement of a public housing project—mere feet from a row of first-floor apartment balconies. And, instead of simply holding Victim A for ransom, the Defendant and Mup physically assaulted and then threatened to *kill* Victim A if he did not give up access to what amounted to just $8,000 in personal valuables. The Defendant and Mup also threatened to kill Victim A's family—mere bystanders having nothing to do with the offense—if *Victim A* later spoke to police.

Worse, although the Defendant has now accepted responsibility for his conduct, the Defendant did not appear to appreciate the seriousness of the offense or respect for law at the time he committed it. To the contrary, the Defendant treated the kidnapping—and his threats to Victim A's life—like it was a game. As the Defendant later boasted to his co-conspirators, Victim A "was scared as shit." The Defendant claimed, "Me and Mup was playing good cop bad cop on [Victim

5

A]. . . . I mean good cop, bad robber." Mup vouched for the Defendant's performance, stating that the Defendant "was bipolar. He would be cool with [Victim A] then motherfucking do the crazy."

### D. The Need to Provide Adequate Deterrence to Criminal Conduct

The need for the sentence imposed to afford adequate deterrence to criminal conduct further supports a 126-month term of imprisonment. *See* 18 U.S.C. § 3553(a)(2)(B).

The case for specific deterrence is obvious. As noted above, the Defendant was previously sentenced to 48 months' imprisonment for committing an armed robbery. But less than two years after the Defendant was released from supervision on that case, the Defendant joined his co-conspirators to commit an armed kidnapping-burglary. *See* PSR ¶ 40. Apparently, the prospect of "merely" a few more years' imprisonment was insufficiently persuasive to deter the Defendant from committing the same criminal conduct again. As for deterring others, a more-than-10-year sentence in federal prison is the type of sentence that has a realistic chance of being noticed by potential repeat armed robbers within the Defendant's community.

### E. The Need to Protect the Public

The need for the sentence imposed to protect the public from further crimes of the Defendant justifies a term of 126 months' imprisonment as well. *See* 18 U.S.C. § 3553(a)(2)(C).

The Defendant is a dangerous repeat offender. The Defendant previously committed an armed robbery that caused the victim to fear for her life. In this case, the Defendant expressed his willingness to use violence to "crush" Victim A even before the need arose. When the Defendant met Victim A, he physically assaulted Victim A and told Victim A that he was "going to die." And, to prevent Victim A from cooperating with law enforcement, the Defendant threatened to kill Victim A's innocent family members.

The Defendant's history also demonstrates that alternatives to incarceration are insufficient to protect the public from his criminal conduct. The Defendant committed the armed robbery in 2013 at a time when he was being monitored by the court through GPS. *See* PSR ¶ 40. And, to the extent the Defendant's mental health problems undermine his ability to comply with the law, the Court should note that it was *the Defendant* who refused to engage with mental health treatment that was offered to him upon his prior release from incarceration. *See id.* ¶ 70.

In this context, only a term of imprisonment that will result in the Defendant's incapacitation until his late thirties is adequate to protect the public.

### F. The Sentencing Guidelines

Finally, a 126-month term of imprisonment is fully consistent with the sentencing guidelines. *See* 18 U.S.C. § 3553(a)(4)(A)(i). The base offense level takes into account that the Defendant committed a kidnapping, specifically. The Defendant's offense level was properly enhanced because he used a dangerous weapon to commit the kidnapping. And the Defendant's criminal history category appropriately reflects the severity of the Defendant's only prior adult conviction. Under these circumstances, a within-guidelines sentence of 126 months' imprisonment is entirely reasonable.

### III. Supervised Release

The government agrees with the Probation Office's recommendation that the Court impose supervised release of five years—the maximum term of supervision under the guidelines and Title 18. *See* PSR at 20. First, the Defendant committed the instant offense between four and five years after being released from his prior term of imprisonment. Second, the Defendant was previously awarded early termination of supervision just three years into his prior five-year term. *See id.* ¶ 40. Had the Defendant not been granted early termination, the Defendant would have been subject to

supervision at the time he committed the kidnapping—potentially modifying the Defendant's behavior. Finally, a length term of supervised release will be critical to ensuring that the Defendant satisfies his obligation to pay an amount of restitution that is significant in light of his outstanding financial liabilities. *See id.* ¶ 80.

### IV. Restitution

Lastly, the Court should order the Defendant to pay the agreed-upon amount of restitution of $8,000, reflecting the full amount of Victim A's losses presently known to the government. *See* ECF 107 ¶ 13. As per the parties' agreement, this amount shall be due immediately and ordered to be paid forthwith. *See id.*

### V. Conclusion

For the reasons set forth above, the government requests that the Court sentence the Defendant to a term of 126 months' imprisonment, to be followed by a five-year period of supervised release, and order the Defendant to pay $8,000 in restitution.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____
Jeffrey J. Izant
Assistant United States Attorney

Jared C. Engelking
Special Assistant United States Attorney