# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal Case No. 21-cr-00080-LKG |
| ) | |
| CHRISTOPHER ALLEN YOUNG, ) | Dated: August 1, 2025 |
| ) | |
| Defendant/Petitioner. ) | |

## MEMORANDUM OPINION AND ORDER

**I.    INTRODUCTION**

On April 5, 2024, the Petitioner/Defendant *pro se*, Christopher Allen Young, filed a motion to vacate, set aside or correct his sentence, pursuant to 28 U.S.C. § 2255.  ECF No. 240. On July 16, 2024, the Petitioner/Defendant filed a motion to "resend information." ECF No. 270. On April 2, 2025, the Defendant/Petitioner filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF No. 273.  These motions are fully briefed. ECF Nos. 240, 250, 261, 261, 265, 770, 273 and 283.  No hearing is necessary to resolve the motions. *See* L.R. 106.5 (D. Md. 2023).  For the reasons that follow, the Court: (1) **DENIES** the Petitioner/Defendant's motion to vacate (ECF No. 240); (2) **DENIES** the Petitioner/Defendant's motion for compassionate release (ECF No. 273) and (3) **DENIES-as-MOOT** the Petitioner/Defendant's motion "resend information" (ECF No. 270).

**II.    FACTUAL AND PROCEDURAL BACKGROUND**

    **A.    Factual Background**

The Petitioner/Defendant, Christopher Allen Young, is currently serving a 126-month sentence of imprisonment after having been convicted of conspiracy to commit kidnapping, in violation of 18 US.C. § 1201(c).  ECF No. 139.  Mr. Young stipulated to the following facts in his Plea Agreement with the Government:

> Mr. Young conspired with Darius Lawrence Young, a/k/a "Mup"
> ("Mup"), Anthony Erik Hebron, a/k/a "Pain" ("Hebron"), Tray David
> Sherman ("Sherman"), and Lamar Jamal Perkins ("Perkins") to kidnap
> Victim A.

**The Kidnapping**

On or about February 3, 2021, Sherman and Hebron met Victim A at the MGM Casino, a casino and hotel in Oxon Hill, Maryland. Sherman and Hebron falsely promised Victim A that they would get women for Victim A if Victim A went with them to Southeast Washington, D.C. At around 7:30 am, Victim A agreed to get into Sherman's vehicle with Sherman and Hebron, and they drove from the MGM to Washington, D.C.

At 8:12 a.m., Mr. Young received a call from Hebron. One minute later, Mr. Young called Mup to report that Sherman and Hebron had "snatched" Victim A. Mr. Young told Mup to get "any kind of gloves" and that "all we got to do is sit in the car" with Victim A while Sherman and Hebron robbed Victim A. Mr. Young told Mup that he was going to split the robbery proceeds with Sherman and Hebron, and that he would pay Mup from his share. Mr. Young added that, if Victim A "gets feisty, I don't want to have to crush him."

Between 8:22 a.m. and 8:30 a.m., Mr. Young called Hebron approximately six times, and the calls between the Petitioner and Hebron lasted a total of 4 minutes and 23 seconds. Soon thereafter, Sherman's vehicle arrived in Southeast D.C., and Mr. Young and Mup got into Sherman's vehicle with Sherman, Hebron, and Victim A. Hebron pointed a gun at Victim A, and Sherman, Hebron, the Petitioner, and Mup took Victim A's personal items, including Victim A's wallet, cellphone, and watch (which had been purchased for approximately $500), and the key to Victim A's hotel room at the MGM. Sherman, Hebron, Mr. Young, and Mup then demanded the code to the safe in Victim A's hotel room. When Victim A refused, Hebron struck Victim A in the forehead with the gun. In response, Victim A gave up the code to his safe. Hebron then forced Victim A out of Sherman's vehicle. Mr. Young and Mup got out of Sherman's vehicle with Victim A, and Sherman and Hebron drove back to the MGM.

As Sherman and Hebron were driving to the MGM, the Petitioner and Mup led Victim A, at gunpoint, to a boiler room inside an apartment building in Southeast D.C. As Mr. Young and Mup took Victim A inside the room, at around 9:10 a.m., Mup called Perkins and directed Perkins to look out for police or anyone else who might be near enough to hear or see the Petitioner and Mup with Victim A. Inside the boiler room, the Petitioner and Mup physically assaulted Victim A and threatened his life. The Petitioner and Mup also demanded that Victim A disclose the PIN number for his ATM card, which was in Victim A's wallet, and provide details about his hotel room, including what was in Victim A's hotel room safe. Mup then relayed this information to Sherman and Hebron by phone.

By 10:00 a.m., Sherman and Hebron had arrived back at the MGM. Video surveillance captured Sherman and Hebron walking empty-handed down the hallway toward Victim A's hotel room. Less than 15 minutes later, video surveillance captured Sherman and Hebron walking back from the area of Victim A's hotel room with a backpack and a roller suitcase. At 10:20 a.m., video surveillance captured Sherman and Hebron walking out of the MGM with the same backpack and roller suitcase. The backpack and roller suitcase contained items that Sherman and Hebron had stolen from Victim A's hotel room, including an Xbox, at least $1,500 in MGM Casino chips, and approximately $6,000 in U.S. currency. The total value of the property stolen from Victim A during the kidnapping (including Victim A's watch, casino chips, and U.S. currency) was at least $8,000.

When Mr. Young and Mup learned that Sherman and Hebron had finished stealing Victim A's property from the hotel room, the Petitioner and Mup fled the boiler room, leaving Victim A behind. At 10:57 a.m., law enforcement observed the Petitioner and Mup walking away from the area of the boiler room and getting into the Petitioner's vehicle, which drove away. Moments later, just before 11 a.m., law enforcement located Victim A near the building in Southeast D.C. Blood was running down Victim A's face from a wound on his forehead. Victim A also appeared to have suffered cuts on his mouth and eye, and a broken nose.

### **The Debrief**

Around the same time that law enforcement located Victim A, Mr. Young and Mup called Sherman and Hebron to debrief the kidnapping. Hebron told the Petitioner and Mup that they were supposed to threaten Victim A and take everything off him. Mr. Young protested, "Man, you're talking to a mother fucking vet!" Mr. Young added, "[Victim A] was scared as shit! I said, 'If the police come, or anything come, I got your address. Mom ... your little brother, all them is gone!'" The Petitioner continued, "I was trying to do the reverse psychology. I was like, man, I said, 'I see why you so tense.' I said, 'Cause you know that money in there and when we find out that money in there, you going to die.' . . . Me and Mup was playing good cop bad cop on (Victim A) . . . . I mean good cop, bad robber." Mup then vouched for Mr. Young, stating, "40 [Mr. Young] was bipolar. He would be cool with [Victim A] then motherfucking do the crazy . . .. 40 [the Petitioner] told [Victim A], 'When you think of somebody, raise a hand. Other than that, shut the fuck up!'"

The continuing conversation revealed that the Petitioner and Hebron had previously discussed kidnapping another target. The Petitioner told Hebron that Mr. Young thought Victim A was "[t]he other dude, you been telling me about." Hebron responded, "Nah, hell, nah! We ain't catching [the other dude] on no bumble like that," meaning that the other target

3

would be more difficult to kidnap. Sherman clarified that the decision to kidnap Victim A was a spontaneous one made by Hebron and Sherman, who stated, "Hey 40 [the Petitioner], I ain't gonna lie, bro, this was just like a little, uh, uh , spur of the moment, little sweet lick, bro, that we were just talking like, not passing up no more licks."

Mr. Young, Mup, Sherman, and Hebron also discussed whether law enforcement would be able to connect them to the kidnapping. Sherman expressed concern about using cards from Victim A's wallet, stating, "I mean if you do it, we got to do it now, we got to hurry up." The Petitioner responded, "Yeah, we got to do that shit now. He ain't got no phone or nothing." Sherman continued, "I just feel like I'm leaving a paper trail, slim." The Petitioner replied, "No, we already left a paper trail by y'all snatching him in your car and me pulling up the way and we holding him captive, that's the way." But the Petitioner added that he and Mup "put [Victim A] in the boiler room. We took him inside so nobody ain't see us or hear. They just seen us walking back there. They don't know what we did."

Mr. Young, Sherman, Hebron and Mup further discussed the possibility that Victim A would speak to police. The Petitioner stated, "[i]f [Victim A] snitch, all he going to say is the niggas grabbed him from MGM and be met up with other motherfuckers. So, regardless, if he snitch, we might be hit. Fuck it. Fuck him." Sherman then rehearsed a defense that he and Hebron could use: "That MGM shit ain't about nothing like, what the fuck . . , he walked us in, walked with us. . . I don't know what happened to you. That nigga be lying." The Petitioner added, "Man, [Victim A] ain't going to tell man. Man, y'all took coke and weed from that man, he ain't going to tell nothing . . . . Man, [Victim A] said . . .' Bro, just swipe all the cards. I don't care.' He said, 'You got all day, I'm going to call tomorrow and report them stolen.'"

Sherman, nevertheless, continued to worry, stating, "I ain't no dummy .. . right now, [Victim A] could rat on me." Referring to the fact that Sherman had driven back to the MGM in his own vehicle, Sherman reflected:

> I was just on camera with the nigga, bro. We was just with him. I already took plenty of chances by going back up there in my own shit. That was the point of me calling you, so I won't go up there in my own shit again. . . . Then I'm saying, bro, like, I can beat the fact that if he rats, like, yeah, they, we, he to , he walked us to the room. Walked us out. We just smoked outside, we just walked to my car, we came back in different clothes, you know what I'm saying? We cool. But when you get to swiping the card, that shit

4

> going to support his, his, his story, somebody robbed him,
> 'cause somebody used his cards. You get what I'm saying?

Mr. Young remained unconcerned, emphasizing, "Son, that nigga, swear to God, he got smacked with a pistol and all that." Sherman agreed, "[Victim A) was fucked up, bro!" The conversation continued:

> Mr. Young: Pain [Hebron] smacked the sense out of his ass.
>
> Sherman: Man, on my mother, he ain't going to the law, bro . . . he's fucked up, he's twisted, bro.
> Mr. Young: Man, that nigga say 'I'm never fucking with no DC niggas ever again in my life. Fuck no!"
>
> Sherman: That's what he said?
> Mr. Young: Bro, he look like he was about cry, he meant that shit.

ECF No. 107 at 10-13.

On February 17, 2022, Mr. Young pled guilty to conspiracy to commit kidnapping, in violation of 18 US.C. § 1201(c). ECF No. 106. In the Plea Agreement, the parties stipulated to an agreed upon sentence of 126 months imprisonment, to be followed by 5 years of supervised release, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(c). ECF No. 107 at 5.

The Pre-sentence report ("PSR") provides that the base offense level for this offense is 32, pursuant to U.S.S.G. § 2X1.1. ECF No. 116 at ¶ 25. A 2-level increase also applies pursuant to U.S.S.G. § 2A4.1(b)(3). *Id*. The PSR further provides that a three-level reduction applies pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b). *Id*. at ¶¶ 32-33. And so, the total offense level is 31. *Id*. at ¶ 34.

The PSR also provides that Mr. Young's criminal history score is three and his criminal history category is Category II. *Id*. at ¶¶ 42-43. And so, this results in a Sentencing Guidelines range of 121 to 151 months imprisonment. *Id*. at ¶ 82.

The Court held a sentencing hearing on May 4, 2022. ECF No. 139. During the sentencing hearing, the Court applied a base offense level of 32, pursuant to U.S.S.G. §§ 2X1.1 and 2A4.1. ECF No. 239 at 4. The Court also determined that a 2-level increase applied, because a dangerous weapon was used. *Id*. The Court also applied a three-level reduction for

acceptance of responsibility.  *Id.*  And so, the Court determined that the total offense level was 31.  *Id.*

In addition, the Court determined that Mr. Young had three criminal history points establishing a criminal history category of Category II.  *Id.*  And so, the Court determined that the applicable Sentencing Guidelines range was 121 months to 151 months imprisonment.  *Id.*

At the conclusion of the sentencing hearing, the Court sentenced Mr. Young to a sentence of 126 months' imprisonment, to be followed by a term of 5 years of supervised release.  ECF No. 140.  The Court entered the Judgment on May 5, 2022.  *Id.*

On March 3, 2023, Mr. Young filed a noticed an appeal, but no appeal was filed.  ECF No. 231.  And so, on June 9, 2023, the United States Court of Appeals for the Fourth Circuit dismissed the appeal.  ECF No. 244.

Mr. Young's projected release date is June 16, 2030.  ECF No. 283 at 7.

### B. Relevant Procedural History

On April 5, 2024, Petitioner/Defendant filed a motion to vacate, set aside or correct his sentence, pursuant to 28 U.S.C. § 2255.  ECF No. 240.  On April 5, 2024, the Government filed a response in opposition to the Petitioner/Defendant's motion.  ECF No. 261.  On May 9, 2024, the Petitioner/Defendant filed a reply brief.  ECF No. 265.

On July 16, 2024, the Petitioner/Defendant filed a motion to "resend information."  ECF No. 270.

On April 2, 2025, the Defendant/Petitioner filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A).  ECF No. 273.  On June 5, 2025, the Government filed a response in opposition to the Petitioner/Defendant's motion.  ECF No. 283.

Mr. Young's motions having been fully briefed, the Court resolves the pending motions.

## III. STANDARDS FOR DECISION

### A. Motions To Vacate

Pursuant to 28 U.S.C. § 2255, a convicted defendant in federal custody may collaterally attack his conviction or sentence on the grounds that it "was imposed in violation of the Constitution or laws of the United States" or "involve[d] a 'fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States v. Mikalajunas*, 186 F.3d 490, 496 (4th Cir. 1999) (quoting *United States v. Addonizio*, 442, U.S. 178, 184-85 (1979)).  A petitioner seeking relief from a final criminal judgment bears the burden of establishing his "[f]actual

6

claims . . . by a preponderance of the evidence." *Higgs v. United States*, 711 F. Supp. 2d 479, 509 (D. Md. 2010) (citing *Miller v. United States*, 261 F. 2d 546, 547 (4th Cir. 1958)). In this regard, a petition filed under Section 2255 "is expected to state facts that point to a real possibility of constitutional error." *United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013) (quoting *Blacklege v. Allison*, 431 U.S. 63, 75 n.7 (1977)). Given this, "vague and conclusory allegations contained in a Section 2255 petition may be disposed of without further investigation by the District Court." *Id*. (quoting *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000)). In addition, Section 2255(f) imposes a strict one-year statute of limitations on the filing of a 2255 petition. 28 U.S.C. § 2255(f). And so, a motion filed pursuant to Section 2255 must be brought within one year of the date on which judgment of conviction became final. 28 U.S.C. § 2255(f)(1).

### B. Motions For Compassionate Release

The United States Court of Appeals for the Fourth Circuit has held that a court "may not modify a term of imprisonment once it has been imposed[.]" 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception to this rule is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

In this regard, Title 18, United States Code, Section 3582(c)(1)(A)(i), commonly known as the "compassionate release" provision, provides a statutory vehicle to modify a defendant's sentence. *United States v. Wiggins*, 2020 WL 4436373, at *2 (D. Md. Aug 3, 2020). Section 3582 was adopted as part of the Sentencing Reform Act of 1984. *Id*. The statute originally permitted a court to alter a sentence only upon a motion by the Director of the Bureau of Prisons ("BOP"). *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). But, in December 2018, Congress significantly modified the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018). Given this, the Court has held that as amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a sentence of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30

7

days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. *Wiggins*, 2020 WL 4436373, at *2. And so, once a defendant has exhausted his or her administrative remedies, the defendant may petition this Court directly for compassionate release. *Id*.

Pursuant to Section 3582(c)(1)(A), the Court may modify a defendant's sentence if, "after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable," it finds that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*Id*. at *3. And so, to be entitled to relief under Section 3582(c)(1)(A)(i), the defendant must demonstrate that: (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with the policy statement issued by the United States Sentencing Commission (the "Commission") in U.S.S.G. § 1B1.13. *Id*.

The Commission is charged with defining "what should be considered extraordinary and compelling reasons for sentence reduction" under 18 U.S.C. § 3582(c)(1)(A). 28 U.S.C. § 994(t). Relevant to the pending motion, "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t); *but see Martin*, 916 F.3d at 397 (explaining that the district court must "factor into" its Section 3553(a) analysis significant evidence of post-sentencing rehabilitation). But, "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d). In addition, Section 1B1.13(b)(5) of the Sentencing Guidelines provides for a reduction of sentence if the Defendant presents any other circumstances or combination of circumstances that, when considered by themselves or together

8

with any of the reasons described in Section 1B1.13(b)(1)-(4), "are similar in gravity." *See* U.S.S.G. § 1B1.13(b)(5).

### C. *Brady* Violations

To establish a *Brady* violation, a criminal defendant must show that the Government failed to disclose "'evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *United States v. Brown*, 576 F. App'x 145, 148 (4th Cir. 2014) (quoting *United States v. Brady*, 373 U.S. 33, 87 (1963)). In the context of an attack on the validity of a guilty plea, evidence is considered material where "there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998) (quoting *Tate v. Wood*, 963 F.2d 20, 24 (2d Cir. 1992)).

### D. Ineffective Assistance Of Counsel

Lastly, when evaluating a defendant's claim of ineffective assistance of counsel, the Court considers whether the conduct of the defendant's attorney fell "within the range of competence normally demanded of attorneys in criminal cases." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). And so, claims of ineffective assistance of counsel are decided by the applying the following two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.*; *see also Roach v. Martin*, 757 F.2d 1463, 1476-77 (4th Cir. 1985); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

In evaluating the first prong of this test, the Court should make every effort to assess the attorney's conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 690. Because of the difficulty in assessing an attorney's performance, the Supreme Court has recognized that there is a strong presumption that defense counsel's conduct was competent. *Id*. And so, the

9

defendant bears the burden of overcoming the presumption that an attorney's actions were based on "sound trial strategy" and proving that defense counsel's assistance did not reach an "objective standard of reasonableness." *Id.* at 688-89.

The second prong of the test requires the defendant to show that the attorney's conduct actually prejudiced the defense. *Id.* To satisfy this prong, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. And so, if the defendant is unable to make both of these showings, "it cannot be said that the conviction. . . resulted from a breakdown in the adversary process" that led to an unreliable verdict. *Id.*

In addition, when a claim of ineffective assistance of counsel relates to a guilty plea, the defendant "must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (citing *Missouri v. Frye*, 566 U.S. 134, 148 (2012)). Given this, the defendant has the burden of proving "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Id.* at 162-63 (2012) (alteration in original) (internal quotation marks omitted) (quoting *Hill*, 474 U.S. at 59). To demonstrate that counsel was constitutionally ineffective when a defendant enters a guilty plea, the defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness and (2) that the defendant was prejudiced as a result. *Lee v. United States*, 582 U.S. 357, 362-63 (2017). The Court must also consider whether there was an adequate showing that the defendant, if properly advised, would have opted to go to trial. *Id.* at 364. And so, only when both prongs of the *Strickland* test are satisfied can it be said that "the conviction … resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

**IV.    ANALYSIS**

Mr. Young seeks to vacate his sentence upon the following three grounds: (1) a due process violation due to the Government's failure to make certain *Brady* disclosures; (2) actual innocence; and (3) ineffective assistance of counsel. *See generally* ECF No. 240. Mr. Young also seeks compassionate release upon the following grounds: (1) his age at the time of the offense; (2) post-conviction rehabilitation; (3) Amendment 829; (4) he is the only available caregiver for his mother; and (5) remorse. *See generally* ECF No. 273. And so, Mr. Young

requests that the Court either vacate his sentence, or grant him compassionate release. ECF Nos. 240 and 273.

In its response in opposition to Mr. Young's motion to vacate, the Government counters that the Court should not vacate his sentence, because: (1) the Government did not violate Mr. Young's due process rights, by failing to disclose *Brady* material and any failure to disclose *Brady* material prior to his guilty plea is not a constitutional violation; (2) Mr. Young provides no facts to support his actual innocence claim; and (3) Mr. Young fails to show that his counsel was constitutionally ineffective. ECF No. 261. The Government also argues that Mr. Young is not entitled to compassionate release, because: (1) Mr. Young has not shown a compelling and extraordinary reason for compassionate release and (2) the relevant Section 3553 factors do not support compassionate release. ECF No. 283. And so, the Government request that the Court deny Mr. Young's motions. ECF Nos. 261 and 283.

For the reasons discussed below, Mr. Young has not shown that the Government violated Mr. Young's due process rights in connection with the prosecution of this case. Mr. Young also advances no facts to support his actual innocence claim, or to show that his former Defense counsel was constitutionally ineffective. In addition, Mr. Young also fails to show an extraordinary and compelling reason for compassionate release and the relevant Section 3553 factors also do not support such relief. And so, the Court: (1) DENIES the Petitioner/Defendant's motion to vacate (ECF No. 240); (2) DENIES the Petitioner/Defendant's motion for compassionate release (ECF No. 273); and (3) DENIES-as-MOOT the Petitioner/Defendant's motion "resend information" (ECF No. 270).

### A. The Court Denies Mr. Young's Motion To Vacate
#### 1. Mr. Young Has Not Shown A *Brady*-Based Due Process Violation

As an initial matter, Mr. Young has not established a due process violation based upon the Government's alleged failure to disclose *Brady* material. To establish a *Brady* violation, Mr. Young must show that the Government failed to disclose "'evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Brown*, 576 F. App'x at 148 (quoting *Brady*, 373 U.S. at 87). In this regard, courts have held within the context of an attack on the validity of a guilty plea, that evidence is considered material where "there is a reasonable probability that but for the failure to

produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." *Avellino*, 136 F.3d at 256 (quoting *Tate*, 963 F.2d at 24).

In his motion to vacate, Mr. Young argues that the Government violated his rights under the Due Process Clause by failing to disclose certain *Brady* material during the prosecution of his case, namely, the victim's request for a bribe from Mr. Young's co-defendant Mr. Sherman. ECF No. 240 at 3. But, as the Government correctly observes, the material that Mr. Young alleges was not disclosed by the Government is not information that must be disclosed to the defense under *Brady v. Maryland*. ECF No. 261 at 6. The subject bribery of a witness occurred after Mr. Young's guilty plea and sentenced in this case. ECF No. 107. Notably, the undisputed facts before the Court show that the victim first sent private messages regarding the bribe to Mr. Sherman, on June 5, 2022, and the victim was subsequently charged and convicted of bribery of a witness. *See United States v. Ghorbani*, 8:22-cr-00361-LKG, ECF No. 32 (D. Md. Oct. 19, 2022).

Given this, Mr. Young has not shown that the subject information was known to the Government at the time of his guilty plea and subsequent sentencing. And so, Mr. Young has also not shown that the Government had an obligation to disclose this material pursuant to *Brady v. Maryland*.

### 2. Mr. Young Fails To Substantiate His Actual Innocence Claim

A careful review of Mr. Young's motion to vacate also shows that he has not substantiated his actual innocence claim. In his motion to vacate, Mr. Young argues that the Court should vacate his sentence, because he is "innocent and plead guilty under duress because the alleged witness fabricated a story to extort [him] and [his] friends." ECF No. 240 at 4. Mr. Young also argues that the victim in this case pled guilty to obstruction of justice offenses related to this case. ECF No. 250 at 3. But, Mr. Young has waived this claim, by failing to raise this argument on direct appeal. *See Yelizarov v. United States*, 2021 WL 690023, at *5 (D. Md. Feb. 23, 2021).

Mr. Young also fails to show that, "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him" of the subject offenses *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 327-328 (1995)). In this regard, Mr. Young relies upon the fact that the victim in this case later pled guilty to bribery of a

12

witness. But, this fact is simply not sufficient to establish *Mr. Young's* actual innocence in this case.

Indeed, as the Government correctly observes, the facts related to the victim's bribery of a witness are not related to the facts regarding Mr. Young's involvement in the kidnapping conspiracy at issue. *See United States v. Pettiford*, 612 F.3d 270, 284 (4th Cir. 2010) (holding that petitioner could not demonstrate actual innocence when he presented no facts to even suggest that he did not commit the crime he was convicted of). Mr. Young also stipulated in his Plea Agreement that the Government could prove beyond a reasonable doubt that he committed the subject offense. ECF No. 107 at 10-13. And so, Mr. Young has not shown that the Court should vacate his sentence upon the grounds of actual innocence.

### 3. Mr. Young Has Not Shown That His Counsel Was Ineffective

Mr. Young's ineffective assistance of counsel claim is also unsubstantiated by the evidence and the litigation history of this matter. When evaluating Mr. Young's ineffective assistance of counsel claim, the Court first considers whether the conduct of the his attorney fell "within the range of competence normally demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 687. In doing so, the Court first considerers whether Mr. Young's counsel made errors so serious that his counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. *Id*. Second, the Court considers whether the deficient performance prejudiced the defense. *Id*.; *see also Roach*, 757 F.2d at 1476-77; *Hill*, 474 U.S. at 57. In addition, when a claim of ineffective assistance of counsel relates to a guilty plea, as is the case here, the Court also considers whether Mr. Young has shown that "the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 162 (citing *Missouri*, 566 U.S. at 148).

Here, Mr. Young contends that his counsel was ineffective, because his counsel failed to "investigate the alleged victim and discover evidence to impeach the alleged victim." ECF No. 240 at 6. In this regard, Mr. Young also contends that, "had counsel conducted a constitutionally effective investigation of the victim, the results would have showed that the victim and government fabricated a story and counsel entered the plea contrary to what rule 11 requires." ECF No. 250 at 4. But Mr. Young has not shown that, considering all the circumstances, his counsel's performance fell below an objective standard of reasonableness, or that he would not have pled guilty and insisted on going to trial but for the allege errors of his counsel.

Again, and as discussed above, Mr. Young's counsel would not have been able to investigate the victim's bribery of a witness, because this conduct occurred after Mr. Young entered his guilty plea in this case and after his sentencing. Mr. Young also advances no facts or evidence to show that he would have proceeded to trial, but for his counsel's allege errors.

As also discussed above, Mr. Young acknowledged in the Plea Agreement that the Government could have proven his guilt at trial beyond a reasonable doubt. Mr. Young also represented to the Court during his plea hearing that he was satisfied with the Plea Agreement and his counsel's representation in this case. ECF No. 238 at 23:2-23:7 ("THE COURT: Are you satisfied with the job that Mr. Harris has done on your behalf? THE DEFENDANT: Yes. THE COURT: Is it still your desire to enter into this plea agreement and plead guilty? THE DEFENDANT: Yes."); *see also Fields v. Attorney Gen. of Maryland*, 956 F.2d 1290, 1299 (4th Cir. 1991) (Statements made under oath affirming satisfaction with counsel are binding on the defendant, unless the contrary evidence is clear and convincing).

Given these facts, Mr. Young simply has not shown that there is a reasonable probability that, but for his counsel's alleged errors, he would not have pled guilty and would have insisted on going to trial. *Fields*, 956 F.2d at 1296-97. And so, the Court must DENY Mr. Young's motion to vacate. *Lemaster*, 403 F.3d at 221-22 (district court should, without holding an evidentiary hearing, dismiss any Section 2255 motion that necessarily relies on allegations that contradict the sworn statements.); *accord, e.g.*, *Ouellette v. United States*, 862 F.2d 371, 378 (1st Cir. 1988) (same).

### B. The Court DENIES Mr. Young's Motion For Compassionate Release

#### 1. Mr. Young Has Not Shown An Extraordinary And Compelling Reason To Warrant Compassionate Release

Turning to Mr. Young's motion for compassionate release, the Court must also deny this motion, because Mr. Young has not shown an "extraordinary and compelling" basis for compassionate release. *Wiggins*, 2020 WL 4436373, at *3 (to be entitled to relief under Section 3582(c)(1)(A)(i), the defendant must demonstrate that: (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with the policy statement issued by the Commission in U.S.S.G. § 1B1.13.). Mr. Young seeks compassionate release upon the following grounds: (1) his age at the time of the offenses; (2) post-conviction

rehabilitation; (3) Amendment 829; (4) he is the only available caregiver for his mother; and (4) remorse. *See generally* ECF No. 273. But Mr. Young has not shown that these circumstances are an extraordinary or compelling reason for compassionate release for several reasons.

First, Mr. Young has not shown that he is sole and primary caregiver for a family member who is "incapacitated." Mr. Young argues in his motion that he is the sole available caregiver his mother, who requires daily care. *See* ECF No. 273 at 13; *see also* ECF No. 273 at 4. In this regard, courts in the Fourth Circuit have recognized that "the BOP considers an individual incapacitated when they have "[s]uffered a serious injury, or a debilitating physical illness and the result of the injury or illness [are] completely disabled, meaning that [they] cannot carry on any self-care and [are] totally confined to a bed or chair." *United States v. Clack*, 2024 WL 4954305, at *3 (E.D.N.C. Dec. 3, 2024) (citing various cases where health conditions did not constitute incapacitation). Here, the medical evidence before the Court shows that Mr. Young's mother suffers from serious health issues. But this evidence is not sufficient to show that his mother is "incapacitated" under the BOP's guidance and applicable case law. Notably, there is no evidence before the Court to show that Mr. Young's mother has been confined her to her bed or chair, due to her health condition. Given this, Mr. Young has not shown an "extraordinary and compelling" reason for compassionate release based upon the need to care for his ailing mother.

Mr. Young's argument that compassionate release is warranted under Amendment 829 is also unconvincing. Amendment 829, which became effective on November 1, 2024, broadens U.S.S.G. § 5H1.1 and provides that "a downward departure may be warranted in cases in which the defendant was youthful at the time of the instant offense or any prior offenses." *See* U.S. Sentencing Comm'n, Guidelines Manuel, App. C., Amendment 829 (2014) (https://www.ussc.gov/guidelines/amendment/829). But Amendment 829 is not to be retroactively applied. *See* U.S.S.G. § 1B1.10(b) ("the court shall substitute only the amendments listed in subsection (d) for the corresponding guideline provisions that were applied when the defendant was sentenced and shall leave all other guideline application decisions unaffected.") (emphasis added). Given this, the amendment cannot be applied to Mr. Young, because he was sentenced on May 4, 2022, before Amendment 829 became effective.

The remaining arguments that Mr. Young advances to support compassionate release, post-conviction rehabilitation and remorse, also do not warrant this relief. While commendable,

15

Mr. Young's rehabilitation while incarcerated, alone, and in combination with his other grounds for compassionate release, is not an extraordinary and compelling reason to reduce his sentence. The Fourth Circuit has held that "rehabilitation alone cannot constitute an extraordinary and compelling reason for release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022); *see also* U.S.S.G. § 1B1.13(d) ("Pursuant to 28 U.S.C. 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."). While post-conviction rehabilitation may be considered in combination with other circumstances when the Court considers whether to reduce a the defendant's term of imprisonment, as discussed below, the facts before the Court do not support compassionate release. *See United States v. Rashaad Thomas*, 2025 WL 1504831, at *12 (D. Md. May 27, 2025) (quoting *Pepper v. United States*, 562 U.S. 476, 492 (2011) (the Court should consider post-sentence conduct as part of the 3553(a) factors).

Lastly, Mr. Young's understandable remorse about engaging in the kidnapping conspiracy at issue in this case is also not an extraordinary or compelling reason for the Court to reduce his sentence. Given this, Mr. Young simply has not met his burden to show an extraordinary and compelling reason to support compassionate release. For these reasons, the Court must DENY Mr. Young's motion for compassionate release.

    **2. The Section 3553A Factors Do Not Support Compassionate Release**

The Court also observes that, even if Mr. Young could establish an extraordinary and compelling reason for compassionate release, the applicable Section 3553(a) factors do not support compassionate release in this case. The kidnapping conspiracy offense at issue in this case is a serious offense. Notably, the stipulated facts in the parties' Plea Agreement make clear that Mr. Young had a significant role in this conspiracy, which involved kidnapping and physically assaulting the victim. *See* ECF No. 107. The Court also shares the Government's concern that a reduction of Mr. Young's sentence would be inconsistent with the important sentencing goals of providing specific and general deterrence from similar criminal conduct. And so, the relevant Section 3553(a) factors also do not support compassionate release in this case.

## V.     CONCLUSION

For the foregoing reasons, the Court:

(1) **DENIES** the Petitioner's motion to vacate (ECF No. 240);

(2) **DENIES** the Petitioner/Defendant's motion for compassionate release (ECF No. 273); and

(3) **DENIES-as-MOOT** the Petitioner/Defendant's motion "resend information" (ECF No. 270).


**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby<br>
LYDIA KAY GRIGGSBY<br>
United States District Judge